HARRIS *v.* ARLEN PROPERTIES, INC., ET AL.

[No. 65, September Term, 1969.]

*Decided December 22, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Carleton U. Edwards, II,* with whom was *Stanley M. Karlin* on the brief, for appellant.

*David Reich* for appellees.

FINAN, J., delivered the opinion of the Court.

This is an appeal in which the application of the Maryland "Long Arm" Statute [1] to nonresident individuals

1. See "The 'Long Arm' Comes to Maryland," 26 Md. L. Rev. 13 (1966) by Professor Bernard Auerbach.

and foreign corporations is the pivotal question. We think that the principles of law laid down in *Vitro Electronics v. Milgray Electronics, Inc.,* 255 Md. 498, 258 A. 2d 749 (1969) and *Novack v. Nat'l Hot Rod Ass'n,* 247 Md. 350, 231 A. 2d 22 (1967), are determinative of the question of jurisdiction.

Leon H. Harris, the appellant and plaintiff below, was a licensed real estate broker of the State of Maryland. He allegedly entered into a "co-op" sales arrangement with another real estate broker Harry A. Boswell, who was one of the defendants below, regarding the "Gudelsky Property," located across the East-West Highway from the Prince George's Shopping Center in Hyattsville, Maryland.

Early in 1964, the plaintiff sent out letters to numerous mercantile establishments including Sears, J. C. Penney Co., Korvette, Marshal Field and the like, advising them of the availability of the "Gudelsky Property." Shortly thereafter the plaintiff was contacted by the defendant Jay Stempel (Stempel), who represented himself as an employee and site location scout of the defendant Arlen Properties, Inc., (Arlen). Arlen is a developer of shopping center sites which acquires the land, constructs the center and then leases the premises to department store tenants and others. Stempel told the plaintiff that Arlen had about eighty shopping centers throughout the nation and "many, many corporations." Arlen Properties, Inc. is a corporation organized under the laws of the State of New York, with its principal office at 60 E. 56th Steet, New York, New York. Stempel and Arlen are among the appellees. Stempel is a resident of New York State.

The plaintiff exhibited to Stempel numerous potential shopping center sites in Prince George's County and Montgomery County, Maryland, and in nearby Virginia, viewing them by way of helicopter, airplane and automobile. In addition the plaintiff, at Stempel's request, forwarded to him aerial photographs of locations, the "Dec-

laration of Restrictions" on the "Gudelsky Property," and information on the "Penn Center Property," the sale of which latter property gave rise to this suit for brokerage commissions.

All of the plaintiff's contacts with Stempel and officers of Arlen were made either personally or by telephone; no letters passed between them. The plaintiff says he met with Stempel many times. The usual procedure was for Stempel to call the plaintiff and arrange to meet him the following day at an airport in the Washington area at about 9:00 A.M. and the plaintiff would take him on an inspection tour of the sites. When air transportation was used to inspect sites, Arlen paid the bill. The plaintiff also marked for Stempel an "Esso" map of the Washington, D. C. metropolitan and suburban area, spotting desirable locations for shopping centers.

In the process of showing Stempel potential sites, the plaintiff, in the early spring of 1966, showed him the "Penn Center Property," comprising approximately 37 acres. He visited the property with Stempel on "possibly five or six occasions." "Penn Center Property" was owned by James C. Dulin and wife, Samuel W. Barrow and wife, Harry A. Boswell and wife, and Henry J. Robb and wife, and the Pennsylvania Avenue Shopping Center, Inc., all party defendants. An employee of Boswell's, one Kloetzli, supplied most of the information concerning the property to the plaintiff who in turn either gave or forwarded it to Stempel. Kloetzli also advised the plaintiff, that in the event he proved successful in selling the property, the commission would be 7%. The plaintiff on one occasion met the defendant-appellee Joseph Comras (Comras), vice president of Arlen and a nonresident of Maryland, and transported him from the airport to a prearranged meeting at Boswell's Hyattsville office, at which time purchase of the "Gudelsky Property" was discussed. The plaintiff also discussed with Comras the purchase of the "Penn Center Property." Still later the plaintiff, at Comras' request, arranged a meeting for him with Boswell in Baltimore to discuss the "Gudelsky Property."

The plaintiff contends that sometime later he learned from Kloetzli, Boswell's assistant, that Comras asserted that he had driven by the "Penn Center Property," saw a sign on it and went to Boswell's office to confer with him about it.

It is the plaintiff's contention that after he was instrumental in bringing Boswell and his associates together with Arlen and its representatives that at Arlen's suggestion it was agreed that the sellers would deal directly with Arlen and by-pass the plaintiff. The plaintiff states that on September 1, 1965, an agreement was reached for the sale of the "Penn Center Property" to Arlen, the general terms of which were worked out in the defendant Robb's office in the District of Columbia. Among those in attendance were Comras, Arlen's attorney Barry Traub, Esq., and Kloetzli. At this meeting Arlen supposedly assumed the responsibility for paying any brokerage commissions in the event a claim for commissions was made. Meanwhile the plaintiff continued his efforts to sell the "Gudelsky Property." He states, however, that about this time Boswell stopped returning his telephone calls and he began "to feel that there was something wrong. . . that everything going on wasn't above the table."

On November 5, 1965, unbeknownst to the plaintiff, Arlen executed a contract to purchase the "Penn Center Property." The plaintiff learned of the sale in February of 1966.

Shortly after the November 5, 1965 contract, Arlen, through its engineering consultants, sought and obtained information from Boswell's office pertinent to topography and drainage of the property. Contacts were also made by Arlen's engineers with the Washington Suburban Sanitary Commission regarding drainage and with the telephone company regarding burying cable. In January, 1966, Arlen's representatives filed site plans with the Prince George's County Building Inspector's Office, and on January 3, 1966, an application for a building permit

was filed. Under the date of September 7, 1966, Arlen assigned all of its interest in the subject property to the defendant Delton Realty Corporation.

On March 10, 1966, deeds of conveyance of the "Penn Center Property" had been executed by the sellers to the defendant Delton Realty Corporation (Delton), a Delaware corporation, which instruments were recorded on September 15, 1966.

According to Arlen's attorney, "The principals of both corporations are identical * * *," *i.e.* Arlen and Delton. Delton's principal business address is c/o A. Levien, 45-10 Court Square, Long Island City, New York, the same as that of Arthur N. Levien, one of the two partners of Arlen Operating Co., a partnership consisting of Arthur N. Levien and defendant-appellee Arthur G. Cohen. This partnership is engaged in owning and developing real estate, and Arlen Properties, Inc., as the affidavit of plaintiff's counsel states, is wholly owned by the partnership. Delton's annual report to the State of Delaware for the year 1966 stated in part "no business transactions, no bank accounts opened, no assets or liabilities."

In May of 1968, the plaintiff filed his declaration against fourteen defendants comprising the sellers and purchasers of the "Penn Center Property" for $112,000 in commissions.[2]

All nonresident defendants were served under the provisions of Maryland's "Long Arm" Statute, Code (1969 Supp. Vol. 7) Art. 75, § 96, except Delton, which having qualified to do business in Maryland was served through its resident agent. Service was obtained on the nonresidents either by registered mail or by having the suit papers served on them by an out of state sheriff.

The Dulins and the four appellees, Arlen, Stempel, Comras and Cohen, raised preliminary objections to the

_____

2. Pennsylvania Avenue Shopping Center, Inc., Dulins, Barrows, Boswells and Robbs were the owner-defendants and Arlen Properties, Inc., Delton Realty Corporation, Stempel, Comras and Cohen were the defendant-purchasers. All of the defendant-purchasers were nonresidents of the State of Maryland and the Dulins, among the sellers, were also nonresidents.

service upon them on the ground that they were nonresidents of Maryland and that they were not engaged in such business in this State as would subject them to the jurisdiction of the courts of Maryland.

In September, 1968, the plaintiff filed an amended declaration extending his causes of action to include counts in express contract, implied contract, and *quantum meruit* against the owner-defendants; for relief against the appellees on the theory that he is a third party beneficiary to the contract between them and the owner-defendants; for recovery on the basis of a conspiracy between all of the defendants, including the appellees, to deprive him of his brokerage commission; and for damages against the appellees for wrongfully inducing the owner-defendants to breach their brokerage contract with plaintiff.

Evidentiary hearings were held on October 30, 1968, and December 23, 1968, before Judge Powers. The matter was fully argued by counsel. On January 6, 1969, the Court entered an order denying the motion of the Dulins who were among the owner-defendants and granting the motion of the appellees who were among the buyer-defendants. This ruling had the effect of dismissing the declaration against the appellees. It is from the judgment of the circuit court dismissing the declaration against the appellees that the plaintiff has filed this appeal. The other defendants named in the declaration are not involved in this appeal, the only appellees being Arlen Properties, Inc., Stempel, Comras and Cohen.

The question before this Court is whether the four appellees were amenable to the jurisdiction in this State by virtue of the provisions of Art. 75, § 96, the "Long Arm" Statute of Maryland which provides:

"§ 96. Personal jurisdiction over person as to cause of action arising from business, etc., in State.

"(a) A Court may exercise personal jurisdiction over a person, who acts directly or by an

agent, as to a cause of action arising from the person's

"(1) Transacting any business in this State;

"(2) Contracting to supply services in this State;

"(3) Causing tortious injury in this State by an act or omission in this State;

"(4) Causing tortious injury in this State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in this State or derives substantial revenue from food or services used or consumed in this State:

"(5) Having an interest in, using, or possessing real property in this State; or

"(6) Contracting to insure or act as surety for, or on, any person, property, or risk, contract, obligation, or agreement located, executed or to be performed within this State at the time of contracting, unless the parties otherwise provided in writing.

"(b) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him. (1964, ch. 95, § 1; 1965, ch. 749; 1968, ch. 707.)"

The rationale of the lower court's opinion with which we disagree, in part, is expressed in the following excerpts from its "Statement Of Grounds For Decision * * *":

"In *Novack v. The National Hot Rod Association,* 247 Md. 350 (1967), the issue before the Court of Appeals was '. . .whether the National Hot Rod Association (Hot Rod), a non-profit California corporation which sponsors and regulates automobile drag races, had sufficient contacts with Maryland on a cause of action re-

lated to its corporate activities in the State . . .' In *Hot Rod, supra,* the contacts with Maryland consisted of four inspections by Hot Rod's agent of a track in Maryland for the purpose of determining whether the track was following the National Hot Rod Association rules required for sanctioning by the Association. The Court of Appeals held such contacts were sufficient.

"In *Hot Rod* the four inspections were of the 'nature and quality' necessary to subject the Association to *in personam* jurisdiction because they were a necessary element of Hot Rod's contract with the Maryland track. Without these inspections there could be no sanction. However, in the instant case the inspections were not so directly related to the sales contract or the alleged tortious acts such that they would be of the 'nature and quality' required to be minimum contacts within the due process requirements."

The lower court elsewhere in its opinion reached the following conclusions:

"As to Joseph Comras, it was established that he was a resident of the State of New York, not the State of Maryland and that he has never been in Maryland in connection with the subject property even though he, as Vice President of Arlen Properties, Inc., participated in negotiations about the subject property in the District of Columbia. With regard to Jay Stempel, it was established that he also was a resident of the State of New York, not Maryland, and that he also was employed by Arlen Properties, Inc., and in this capacity was in Maryland a number of times physically inspecting many properties including the subject property but never conducted any negotiations about the subject prop-

erty. It was also established that Arthur Cohen was a resident of the State of New York, not Maryland, and that he has never been in Maryland with regard to the subject property nor has he conducted any negotiations regarding the subject property. Finally, as to Arlen Properties, Inc., it was established that this defendant was not qualified to do business in Maryland; that it is a New York corporation and does not have an office in Maryland; that all negotiations and the signing of the contract took place in the District of Columbia; and that its contract of purchase has been assigned to another defendant in this action, Delton Realty Corp. which has title to the property.

"The Court concluded, as a result of their lack of activity within the State of Maryland, that the defendants Comras and Cohen do not have sufficient contacts with Maryland out of which this cause of action arose; therefore, the due process requirement of *International Shoe, supra,* is not satisfied leaving this Court without *in personam* jurisdiction.

"As to Stempel his only contacts with the State of Maryland are his trips to physically inspect properties within this State including the subject property. The Court concluded that the mere inspection of the subject property was not of the 'nature and quality' such that it would subject him to the *in personam* jurisdiction of this Court. The Court further concluded that even if the activity of Stempel was such that it would be considered 'transacting any business' in Maryland, jurisdiction in this case would offend the due process requirement of *International Shoe, supra.*

"The only contacts of Arlen Properties, Inc., with the State of Maryland are (1) the inspec-

tion of the subject property by its agent, Stempel, and (2) the fact that the subject matter of a contract entered into by it lies within Maryland. As to the first enumerated contact, the Court feels that the conclusion reached with regard to Stempel applied to Arlen Properties, Inc., for the same reasons."

Before applying the law as we see it to the case at bar we think it helpful to briefly review the cases which illustrate the liberal trend in the area of state jurisdiction over foreign corporations and nonresident individuals. In 1945 the Supreme Court of the United States made a significant breakthrough in the expansion of state jurisdiction in *International Shoe Company v. State of Washington,* 326 U. S. 310, 316, by its pronouncement:

> "Due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' * * *."

Additional guidance in applying the doctrine of *International Shoe Co.* was given by the Supreme Court in *Hanson v. Denckla,* 357 U. S. 235 (1958) when it stated:

> "It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state—thus invoking the benefit and protection of its laws."

In our own State the Legislature sought to provide a more flexible approach to jurisdiction by enacting our present "Long Arm" Statute, Chapter 95 of the Acts of 1964. This Court recognized that there was a purposeful effort on the part of the Legislature to broaden jurisdiction by expanding it to the boundaries of permissible con-

stitutional limits. See *Gilliam v. Moog Industries, Inc.,* 239 Md. 107, 210 A. 2d 390 (1965) and the later cases *Vitro Electronics v. Milgray Electronics, Inc.,* 255 Md. 498, 258 A. 2d 749 (1969); *Novack v. Nat'l Hot Rod Ass'n,* 247 Md. 350, 231 A. 2d 22 (1967); and *Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 164-65, 215 A. 2d 812 (1966). In *Hot Rod,* Chief Judge Hammond gave such comprehensive coverage to the history of the "long arm" development from *International Shoe Company* to the present, that further discussion of the cases here would be an unwarranted repetition.

We agree with the lower court, for reasons hereafter stated, in its holding that the appellee Comras was not amenable to the jurisdiction of the lower court. However, we think the court went astray in its opinion when it held that the actions of appellees Arlen, Stempel and Cohen did not come within the scope of *Hot Rod.* The lower court's decision turned on its interpretation of the "nature and quality" of the acts done in Maryland by Arlen through its agents. The court stated: "In *Hot Rod,* the four inspections were of the 'nature and quality' necessary to subject the Association to *in personam* jurisdiction because they were a necessary element of Hot Rod's contract with the Maryland track. Without these inspections there could be no sanction. However, in the instant case the inspections were not so directly related to the sales contract, or the alleged tortious acts such that they would be of the 'nature and quality' required to be minimum contacts within the due process requirement." To the contrary, we think that the plaintiff, on the basis of the evidentiary hearing, made out a *prima facie* case, in that acts were performed and a persistent course of conduct pursued by Arlen, its officers and agents, within the State of Maryland which were of a purposeful nature and constituted the "transacting of business," within the intent and purview of Article 75.

Furthermore, we are of the opinion that Stempel was engaged in a persistent course of conduct in Maryland, and that his acts pertaining to the commissions of the

plaintiff, with reference to the sale of the "Penn Center Property," may have been tortious, thus, rendering him, individually, subject to suit in Maryland.

The record would support the fact that Arlen, which is owned by the partnership Arlen Operating Company of which Arthur G. Cohen and Arthur N. Levien are partners, was engaged in the business of developing and leasing shopping centers. Certainly it is a vital and necessary function to the successful pursuit of such an enterprise that choice locations be sought and acquired. While the mere scouting for locations may not have constituted the minimum contacts necessary to render Arlen amenable to jurisdiction, the actions of its agents went much further in the instant case. In addition to numerous inspections of the Prince George's County area for shopping center locations, the record discloses that its engineers filed a building permit with the Prince George's County Building Inspector's Office on January 3, 1966. It was not until some months later that Arlen assigned its interest in the "Penn Center Property" to Delton. There were also negotiations during January of 1966 concerning easements with the C. & P. Telephone Company regarding burying telephone cable at the shopping center site. Furthermore, as early as December, 1965, before Delton was in the picture, Wirden, an engineer working for Arlen, had arranged for the installation of storm drains at the "Penn Center Property" with the Washington Suburban Sanitary Commission. We have no difficulty in determining that these actions were purposeful actions which constituted "transacting of business" and represented "a persistent course of conduct in Maryland."

In *Van Wagenberg, supra,* Judge Oppenheimer in discussing the "Long Arm" statute of the State of New York, dealt at length with the interpretation given the New York statute by Judge Fuld in *Longines-Wittnauer Watch Co. v. Barnes & Reinecke,* 15 N.Y.2d 443, 209 N.E.2d 68, 261 N.Y.S.2d 8 (1965), noting:

"* * * Judge Fuld repeatedly referred, not to

commerce or transactions for profit, but to acts done within the state. He emphasized that the legislature had not confined the jurisdictional reach only to contracts made within the state, and that the design of the statute was to assert jurisdiction over any 'purposeful activity' in the state. There is a strong influence, in his analysis, that the phrase 'transaction of any business' includes but is not limited to, contracts of any kind made within the state, and 'purposeful activity' of any kind, within the state." *Id.* at 166.

The lower court noted that the contract for the purchase of the "Penn Center Property" was negotiated outside of the State and the execution of it took place in the District of Columbia. We deem this of no material consequence. Such an element presented itself in *Hot Rod, supra,* and was disposed of by the Court with some dispatch when it stated:

"Hot Rod argues that its contracts with Aquasco were made in California. This is not decisive. *Van Wagenberg* pointed out what *Longines-Wittnauer,* 209 N.E.2d at 75, held, that '* * * even though the last act marking the formal execution of the contract may not have occurred within [the State] the statutory test [of transacting any business] may be satisfied by a showing of other purposeful acts performed by the appellant in this State in relation to the contract, albeit preliminary or subsequent to its execution.' "

We have focused our attention in this opinion on the actions of Arlen and Stempel, primarily, because we think a full understanding of the role Arlen and its agents played in regard to the acquisition of the "Penn Center Property" is the key as to the question of liability as to the other appellees, Comras and Cohen.

As we read the record, the assignment of Arlen's interest in the "Penn Center Property" to Delton occurred on September 7, 1966. Prior to that time a search for a suitable location, the negotiations for the purchase of the site location, the filing of the building permit and other necessary acts were conducted by Arlen through its agents. Stempel came to Maryland on a number of occasions and obtained information vital to the acquisition of the "Penn Center Property" and, as we have stated, we find no difficulty in holding that he was "engaged" in a persistent course of conduct in Maryland.

With reference to Cohen's amenability to jurisdiction, although he never appeared in Maryland in relation to any business concerning the "Penn Center Property," nonetheless, the record could support a finding that Cohen is a partner of Arlen Operating Company, which in turn owns Arlen Properties, Inc. The address of Arlen Operating Company is 45-10 Court Square, Long Island City, New York, which is the same address as the principal business address of Delton and of the engineering firm which prepared the plans for the shopping center at "Penn Center Property." In addition there is a letter in the record from the attorneys representing Arlen addressed to defendant Robb, relative to the substitution of Delton in the place of Arlen as the purchaser of the "Penn Center Property" which states: "The only asset of the new corporation will be the property acquired from you, which also would be the only asset of Arlen Properties, Inc. The principals of both corporations are identical and as you know are very substantial builders. In light of the aforegoing you should not be concerned about the change in corporate entities."

As we stated in *Vitro Electronics, supra,* "* * * [W]e are not prepared to adopt a doctrine which, in our opinion, would have the effect of breaking down observed distinctions between parent and subsidiary corporations, where fraud or deception is not present * * *." However, we think that in order to hold the corporate veil

inviolate, at least insofar as jurisdiction is concerned, it is necessary as a factual matter that a corporation have some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding. *Thomas v. Hudson Sales Corp.*, 204 Md. 450, 105 A. 2d 225 (1954) is a case where a supplier of steel ingots sued Hudson Motor Car Company, a Michigan corporation, to recover $66,000 owed for the delivery of steel at Pittsburgh, Pennsylvania. The writ of summons was issued in Maryland against Hudson Motor Car Company and returned *non est*. A writ of attachment was then served in Maryland upon Hudson Sales Corporation, also a nonresident corporation, by service on the Maryland State Tax Commission. Hudson Sales Corporation, as garnishee, moved to quash the attachment on the grounds that it was not doing business in Maryland and this Court reversed the lower court which had granted the motion. We think what the Court said in *Hudson,* wherein the corporate veil was pierced, is apposite to the case at bar:

> "It appears in the instant case that the appellee has gone beyond the pattern of immunity, heretofore set out. As in *La Porte Heinekamp Motor Co. v. Ford Motor Co., supra,* [24 F. 2d 861 (1928)] while Hudson Motor does not maintain within Maryland an agent with authority to bind it by contract, nevertheless, the actual supervision and control exercised by Hudson Sales through its representatives in Maryland is almost as complete as if representatives of Hudson Sales in this State were the sales department of Hudson Motor for the sale of Hudson automobiles and parts * * *." *Id.* at 463.
>
> * * *
>
> "As contended by the appellee, this case must be judged as one between Hudson Motor and Hudson Sales * * *. We are informed that all

the books, records and main offices of Hudson Motor and Hudson Sales are permanently located in Detroit, Michigan, where the officers of the two companies reside. We are also informed that the offices of the two corporations are in the same building in Detroit. The suit therefore is to be judged as one between two people who live in the same house * * *." *Id.* at 566.

See also *White v. Caterpillar Tractor,* 235 Md. 368, 201 A. 2d 856 (1964).

The record would support the finding that the sole purpose for the corporate existence of Arlen and Delton is to hold title to real estate for the benefit of Arlen Operating Company of which Mr. Cohen is a partner. Delton is listed as having a business address at both 60 E. 56th Street, New York, New York and 45-10 Court Square, Long Island, New York, and that the business address of Arthur G. Cohen, President of Delton, is 60 E. 56th Street, New York, New York. The business address of Arlen is likewise 60 E. 56th Street, New York, New York.

We are of the opinion that Cohen is amenable to jurisdiction by virtue of the fact that the record could support the conclusion that he is a partner of Arlen Operating Company, and although he was sued in his individual capacity, rather than as a partner, we do not view this as material as the suit arises out of partnership business. See Maryland Code (1967 Repl. Vol.), Art. 73A § 15 (The Uniform Partnership Act) and *Phillips v. Cook,* 239 Md. 215, 223, 210 A. 2d 743 (1965).

Finally, with regard to the appellee Comras, vice president of Arlen, we do not think that the record supports activity on his part in Maryland with regard to the "Penn Center Property," which would provide the minimum contacts necessary to render him individually amenable to the jurisdiction of the courts of this State. It would appear that he made but one trip to Maryland and this was to view the "Gudelsky Property," not the "Penn

Center Property." The mere fact that on this single trip he was looking for shopping center sites and that the plaintiff made casual mention of the "Penn Center Property" to him, without more, is not sufficient for jurisdiction to attach. There is no evidence that he committed any tortious act which was the result of, or in the course of, a persistent course of conduct on his part in Maryland.

We emphasize that there has been an evidentiary hearing only in this case at which the sole question of jurisdiction was before the court. A different picture may develop at a hearing on the merits. However, we think that at this posture of the proceeding the plaintiff has made out a case of jurisdiction over the appellees, on the basis that their actions in the State constituted sufficient minimum contacts as to warrant the exercise of jurisdiction without offending "traditional notions of fair play and substantial justice."

> *Order granting the motion raising preliminary objections as to appellee Comras affirmed, and the same order reversed as to appellees A r l e n Properties, Inc., Stempei and Cohen; appellant and appellees to divide costs.*